Decision and Journal Entry.
{¶ 1} Appellant, Mark A. Barclay, appeals from his convictions in the Summit County Court of Common Pleas for murder, kidnapping, and abuse of a corpse. We affirm.
 I. {¶ 2} On February 12, 2002, the Summit County Grand Jury indicted Mr. Barclay on four separate counts: (1) one count of aggravated murder, in violation of R.C. 2903.01(A); (2) two counts of kidnapping, in violation of R.C. 2905.01(A)(3); and (3) one count of abuse of a corpse, in violation of R.C. 2927.01(B). Thereafter, the State moved to amend the indictment, and the trial court granted the motion. Accordingly, the aggravated murder charge, as contained in the original indictment, was reduced to the lesser and included offense of murder. A jury trial followed. The jury returned a verdict of guilty on all counts, and the trial court sentenced Mr. Barclay accordingly. Mr. Barclay timely appeals and raises one assignment of error for review.
 II. Assignment of Error "[Mr. Barclay's] convictions were against the manifest weight of the evidence." {¶ 3} In his sole assignment of error, Mr. Barclay challenges the adequacy of the evidence presented at trial. Specifically, Mr. Barclay avers that his convictions for murder, kidnapping, and abuse of a corpse were contrary to the manifest weight of the evidence. We disagree.
 {¶ 4} "[A] manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390
(Cook, J., concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 5} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id. Furthermore, the evaluation of the weight to be given to the evidence and evaluation of the credibility of the witnesses are functions primarily reserved for the trier of fact. Statev. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757.
 {¶ 6} Mr. Barclay was found guilty of murder, in violation of R.C.2903.02(A), which provides, "[n]o person shall purposely cause the death of another[.]" The jury also found Mr. Barclay guilty of kidnapping, in violation of R.C. 2905.01(A)(3). R.C. 2905.01(A)(3) states, in relevant part, "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o terrorize, or to inflict serious physical harm on the victim or another[.]" Finally, Mr. Barclay was found guilty of abuse of a corpse, in violation of R.C. 2927.01(B). This section provides that "[n]o person, except as authorized by law, shall treat a human corpse in a way that would outrage reasonable community sensibilities." R.C. 2927.01(B).
 {¶ 7} At trial, Robert Smarr ("Smarr") testified that he discovered a man's body in a drainage ditch under an I-76 overpass on November 17, 2001. He explained that he discovered the body because a man's leg stuck out from under a board covering the drainage ditch. Smarr further testified that he immediately notified the authorities of his discovery.
 {¶ 8} Officer Eric Wells testified that he received a dispatch concerning the discovery of a body. He stated that when he arrived at the crime scene he saw a board covering the drainage ditch, and the board was "shoved off just a little[,]" thereby exposing a man's foot and leg. Officer Wells further testified that he moved the board and observed a body that had been wrapped and bound in sheets.
 {¶ 9} Detective William Laughlin testified that he learned that four individuals discovered a body in a drainage ditch. He described the dimensions of the drainage ditch as 5'5" by 5'5" and 3' deep. Detective Laughlin additionally stated that the drainage ditch was filled halfway with debris.
 {¶ 10} Detective Laughlin testified that he spoke with numerous individuals during the course of his investigation, including Denni Payne ("Payne"), Kimberly Martin ("Martin"), Robert Greathouse ("Greathouse"), and Jennifer Wohlford ("Wohlford"). After speaking with Payne, Detective Laughlin explained that he learned that the incident took place at 703 Thayer Avenue, which was Payne's residence. He also testified that Payne informed him that Mr. Barclay, Martin, Greathouse, Wohlford, and Maynard Nettle ("Nettle") were involved in the incident.
 {¶ 11} Detective Laughlin asserted that Martin told him that the incident took place on the day she went to the Bureau of Motor Vehicles ("BMV") to renew her driver's license. He then asserted that Martin, Greathouse, and Wohlford named the same individuals as participants in the crime; specifically, those named included Mr. Barclay, Martin, Greathouse, Wohlford, Nettle, and Payne. Finally, Detective Laughlin conceded that he did not have any physical or scientific evidence linking Mr. Barclay to the murder.
 {¶ 12} Kathy Pritchard ("Pritchard") testified that she works at the BMV as a supervisor. She asserted that Martin came in to the BMV on November 6, 2001.
 {¶ 13} The testimony of Wohlford, Payne, Martin, Greathouse, and Nettle revealed that on November 6, 2001 Mitchell Strodes ("Strodes"), the victim, arrived at 703 Thayer Avenue and asked Martin if she had any work that he could do for her. Martin told Strodes he could transport her belongings from her car to the trunk of Payne's car and rake the leaves. Thereafter, Martin, Greathouse, and Nettle proceeded to the BMV.
 {¶ 14} When they returned from the BMV, Martin asked Greathouse and Nettle to retrieve a radio that Strodes allegedly placed in the trunk of Payne's car. Wohlford testified that Greathouse and Nettle returned from the garage, and Greathouse said, "[t]here ain't nothing in the trunk of that car." Wohlford further stated that Mr. Barclay was made aware of the situation, and Mr. Barclay said to Martin, "[l]et me go find him for you. I will go find him for you. I will bring him back here. I will take care of him for you." Martin added that Mr. Barclay angrily stated numerous times, "I am going to kill that mother fucker for ripping you off."
 {¶ 15} Subsequently, Strodes returned to 703 Thayer Avenue and entered the residence. While inside, Martin accused Strodes of stealing her belongings, and began hitting him on the head with an ASP baton. Mr. Barclay held Strodes' arms behind his back during Martin's assault. Mr. Barclay also began hitting and kicking Strodes.
 {¶ 16} During the "beating," Mr. Barclay attempted to "tie * * * up" Strodes with wire cable; however, he was unsuccessful and he became flustered. As a result, he asked if anyone had a gun and said, "if he had a gun he would just finish the job and it would be over with." Mr. Barclay then tied Strodes up in a sheet and instructed the others to stand on Strodes in an attempt to knock him unconscious.
 {¶ 17} Mr. Barclay, Nettle, and Payne discussed what they should do with Strodes. Following their discussion, Mr. Barclay and Nettle carried Strodes outside and placed him in the trunk of Payne's car. Nettle drove Payne's car as Mr. Barclay gave him instructions. While en route, Nettle heard noises and realized Strodes was alive. Mr. Barclay then told Nettle to pull over onto a gravel road underneath an overpass. Nettle stated he saw Mr. Barclay hitting Strodes with a jack stand, and heard Mr. Barclay say "[w]e don't have to worry about that, he is dead now." Nettle then explained that Mr. Barclay threw Strodes on the ground and put him in "some sort of culvert or a hole[,]" and asked Nettle to "[h]elp [him] cover [Strodes] up."
 {¶ 18} Dr. Lisa Kohler, the chief medical examiner for Summit County, testified as to the injuries Strodes sustained in the assault. In particular, Dr. Kohler described his injuries as a fractured jaw; numerous abrasions on the scalp, chest, abdomen, arms, hips, thighs, and calves; multiple bruises on the scalp, ribs, and wrist; and trauma to the brain. Although Dr. Kohler could not testify as to what instrument caused Strodes' injuries, she testified that the cause of death was "multiple blunt injuries to the head due to being beaten by an assailant [or] * * * assailants[,]" and that the manner of death was homicide.
 {¶ 19} Following the State's witnesses, the defense presented its evidence and witnesses. Sandra Vinson Sanders ("Sanders") testified that she met Martin in the Summit County Jail and spoke to her regarding her case. Sanders stated that Martin told her that she controlled the men in the case and that Mr. Barclay was not involved in the murder. Sanders further commented that Martin did not show any remorse for her actions.
 {¶ 20} Detective Juanita Elton testified that she interviewed Norman Barnes ("Barnes") concerning the homicide. She stated that Barnes named five individuals that may have been involved in the homicide, but that he did not name Mr. Barclay. Detective Elton noted that Barnes obtained the names of the five individuals from Patrick Goodman ("Goodman").
 {¶ 21} Goodman testified that he has never seen Mr. Barclay act violently; however, he has seen Martin, Payne, Greathouse, and Nettle act violently. He did acknowledge that he and Mr. Barclay are friends.
 {¶ 22} Goodman stated that he was at 703 Thayer Avenue on November 6, 2001, and watched Strodes transport Martin's belongings and rake the leaves. He explained that Martin paid him to watch Strodes. He further stated that Martin later told him that she had killed Strodes and named the other individuals involved; Martin did not mention Mr. Barclay. Goodman then testified that Wohlford informed him of those involved in the incident, and she, too, did not name Mr. Barclay. Finally, Goodman asserted that he watched a videotape of the murder and did not see Mr. Barclay on the videotape. He admitted that he had denied knowledge of the videotape to the police officers. He further acknowledged that he did not disclose to anyone his presence at 703 Thayer Avenue on November 6, 2001.
 {¶ 23} In response to the defense witnesses, the State called Sergeant Ray Youngkin. Sergeant Youngkin testified that he spoke with Barnes, and, based on this conversation, he began to look for the videotape. He explained that a search warrant was procured for 703 Thayer Avenue. Sergeant Youngkin asserted that the search of 703 Thayer Avenue did not uncover a videotape, a camcorder, a video recorder, or anything of that nature.
 {¶ 24} After careful review of the record, we are unable to conclude that the trier of fact lost its way and created a manifest miscarriage of justice when convicting Mr. Barclay of murder, kidnapping, and abuse of a corpse. Although conflicting testimony was presented, we refrain from overturning the verdict because the jury chose to believe other testimony. "[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the [trier of fact] believed the prosecution testimony."Gilliam, supra. Consequently, Mr. Barclay's convictions were not against the manifest weight of the evidence. Accordingly, Mr. Barclay's sole assignment of error is overruled.
 III. {¶ 25} Mr. Barclay's assignment of error is overruled. The convictions in the Summit County Court of Common Pleas are affirmed.
Judgment affirmed.
SLABY, P.J., WHITMORE, J. CONCUR.